**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David N. Evers,<br><br>                Plaintiff,<br><br>vs.<br><br>Safety-Kleen Systems, Inc., a Wisconsin corporation,<br><br>                Defendant. | No. CV 10-02556-PHX-NVW<br><br>**ORDER** |

Before the Court is "Defendant's Motion for Summary Judgment" (Doc. 32). For the reasons stated below, the motion will be denied as to Plaintiff's claim for unpaid wages and granted as to Plaintiff's retaliation claim.

**I.    BACKGROUND**

The following facts are undisputed unless attributed to one party or the other or otherwise specified.

**A.    Evers' Employment at Safety-Kleen**

Defendant Safety-Kleen Systems, Inc., is in the business of collecting and disposing of or recycling environmentally hazardous materials. It markets its services to, among other things, car service and repair shops, from which it can collect substances such as spent motor oil.

Safety-Kleen hired Plaintiff David Evers in 1996. Evers joined Safety-Kleen's Chandler, Arizona, office as an automotive service representative. Since that time, he has

held various positions within the company. For example, in 2003 he held the title of market sales specialist. In 2007, he left the Chandler office to become general manager of Safety-Kleen's El Paso, Texas, office. However, he returned to Chandler about nine months later, claiming that his boss in El Paso had expected Evers to go along with allegedly unethical or illegal conduct, and Evers did not want to remain in that environment. Back in Chandler, Evers took the role of an oil service representative.

Les Bell was general manager of the Chandler branch when Evers returned from El Paso. Bell and Evers had a good relationship at that time. Bell promoted Evers to the position of senior sales and service representative, and then to customer service manager. The promotion to customer service manager made Evers the second customer service manager in the office, behind Brian Harvey, who was commonly known as the "lead" customer service manager. Evers claims that Bell told him on more than one occasion that he was unhappy with Harvey's performance, and once told him (at an unspecified time) that was thinking of making Evers the lead customer service manager.

### B.     The 2009 & 2010 Compensation Plans

In 2009, Safety-Kleen compensated Evers under the terms of a written plan titled "2009 Customer Service Manager Compensation Plan." Under the 2009 compensation plan, Evers received a base yearly salary of $47,500 with commissions (if earned) of up to 44% of base salary, paid at the end of 13 separate four-week periods. The 2009 compensation plan states that it "applie[d] . . . beginning Period 1, 2009," and that it could be modified, changed, amended, or terminated at any time in Safety-Kleen's discretion. (Doc. 33-1 at 38, 42–43.)

Safety-Kleen followed the 2009 plan through the 13 four-week pay periods in 2009, the last of which ended on December 27 of that year. Period 1 of 2010 began on December 28, 2009. Toward the end of that period — in late January 2010 — Evers fortuitously stumbled on an in-house webinar describing a new plan for 2010 that applied retroactively beginning December 28, 2009. Evers learned from that webinar that the

2010 plan increased his salary somewhat, but reduced the maximum commission to 33% of base salary and paid commissions quarterly, rather than every four weeks.

### C.  Evers' Complaints About the Retroactive Effect of the 2010 Plan

Evers talked to Bell (the branch manager) and Harvey (the other customer service manager) about the changes.  All agreed that the changes were unfair.  During this conversation, Evers remarked that someone should complain "to the labor board" (by which he meant the Industrial Commission of Arizona, which has jurisdiction over some wage disputes, *see* A.R.S. § 23-356).  Evers did not perceive much of a reaction from either Bell or Harvey to that comment.  Given that the 2010 plan had promised base pay increases, they all decided to wait and see about that change before taking any further action.  But all three still felt the plan was unfair when they later learned of their new base pay.  Evers specifically believed it was wrong for Safety-Kleen to announce the 2010 plan at the end of January 2010, and make it retroactive to December 28, 2009.  Evers had a general sense that such retroactivity was unlawful.

Soon after Evers, Bell, and Harvey learned about the 2010 plan, Bell informed his boss, Kevin Preston (a regional manager), that Evers had threatened to take legal action regarding the plan.  According to Bell, Preston replied by saying that forthcoming details about the plan would hopefully satisfy the situation.  Over the next few weeks, Evers, Bell, and Harvey received more details and discussed the 2010 plan changes.  On at least five occasions, Evers told Bell and Harvey that he continued to think about going to the labor board.  Neither Bell nor Harvey ever attempted to dissuade Evers from going to the labor board.

### D.  Evers' Encounter with Bell Regarding the Computer System Conversion

The only negative interaction between Evers and Bell regarding the 2010 plan took place in late February or early March 2010 when Bell called a meeting with Evers and a few others in the branch to discuss the problems Safety-Kleen was having in converting to a new computer system.  To ensure a smooth transition, Bell told Evers and

the others present at the meeting that they needed to work very long hours, including all weekend. Evers responded that he would not work so many extra hours without additional compensation, especially in light of the recent compensation plan changes that he believed denied him money he had earned. He again stated that he continued to think about going to the labor board. Bell responded that he would make sure "Kevin and the higher-ups" knew how Evers felt (referring to Kevin Preston, the regional manager). Evers "asked Bell if that was a threat, and Bell replied that he just wanted [Evers] to know that he would make sure that they all knew how [Evers] felt." (Doc. 33 at 5.) Evers does not recall any further conversations about the compensation plan change, but he says that he felt some friction between himself and Bell after this incident.

At the end of 2010's first quarter, Safety-Kleen compensated Evers under the 2010 plan's commission schedule. Evers claims that such compensation was $900 less than what he would have earned if the 2009 plan had remained in place for Period 1, 2010.

### E. Preston's Decision to Eliminate a Customer Service Manager Position

In the midst of the compensation plan changes and computer system conversion, Preston (the regional manager) was evaluating potential cost savings in his region. He discovered that, of the nine branches he supervised, the Chandler branch did not employ the most people nor did it have the highest revenue, but it was the only branch with two customer service managers — Evers and Harvey. Preston discussed the situation with a regional human resources director, Rob Maroney. Maroney informed Preston that, of approximately 24 branches in the western United States, only Chandler had two customer service managers. Preston and Maroney concluded that they could not justify having two customer service managers in Chandler, and they decided in March 2010 that they would eliminate one of those positions.

### F. Evers' Termination According to Safety-Kleen

Maroney contacted Bell and asked him to complete a standard "Forced Order Ranking" document that Safety-Kleen uses to compare employees — in this case, Evers and Harvey. Bell's Forced Order Ranking compared Evers and Harvey to each other and

to each person's scores from a 2008 evaluation. Regarding Evers, Bell wrote (in relevant part):

> Quantity of Work — Shortly after [Evers] returned to this branch from El Paso he demonstrated the desire and drive to grab hold of his new role[.] . . . Over the past twelve months or so [Evers'] leadership and focus have waivered [*sic*]. He has missed some significant time due to personal matters and has incurred a DUI which has rendered him ineffective in terms of expectations of productivity on a route.
>
> Working Relationships — [Evers] tends to have a difficult time in not allowing a relatively minor issue from escalating to a bigger problem. He has worked hard to make sure that in dealing with reps and peers that he is fair and balanced and provides a coaching and mentoring approach to solving issues. In recent months [Evers] has had some difficulty in keeping focus on this and has had some instances where issues that should be easy to solve became issues that had to have the mediation of the [branch general manager]. Most of these issues are small taken singly, but a pattern can develop and [Evers] must work hard to erase any perception of him that he does not treat people with respect.
>
> Reliability — [Evers'] score slips slightly here due to a very large amount of time missed due to personal issues as well as his DUI. It is mostly public knowledge among the reps that he has a DUI — through his own discussion of the topic — and it has weakened his stature as a leader as well as becoming the go to guy and motivator that a [customer service manager] needs to be.
>
> Safety/Compliance — score slips slightly here. [In language made cryptic through corporate jargon and various acronyms, document goes on to describe an incident in which a trainee driving a Safety-Kleen truck accidentally backed into a stationary object. Evers was in the passenger seat at the time, talking on his cell phone.] While this [accident] does not fall entirely on his plate, he is a key piece in ensuring our reps are compliant daily and during checkout. This was a critical miss.

(Doc. 33-2 at 28–29.) In contrast to Evers' declining scores, Bell went on to write that Harvey had significantly improved in many areas.

In a declaration submitted for purposes of summary judgment, Bell elaborated on his Forced Order Ranking as follows:

> When [Evers] returned to Chandler [from El Paso], he threatened to take legal action against [Safety-Kleen] on several different occasions based on what had allegedly occurred in El Paso.
>
> [Evers] made several statements to me about wanting to sue [Safety-Kleen] over what happened in Texas . . . .
>
> [Evers] would get frustrated about some aspect of work and would let that frustration boil over into a claim that he was going to sue [Safety-Kleen] over an unrelated matter. [Evers] was always exaggerating problems and making them into much more than they were. That is just the way [Evers] was. He was a complainer.
>
> I did not let [Evers'] many complaints about [Safety-Kleen] or his threats to sue the company affect my judgment on his performance or abilities in any manner.
>
> I promoted [Evers] to a Senior Sales and Service position and subsequently promoted him to a [customer service manager] position in Chandler. His promotion to [customer service manager] definitely occurred after he made threats to sue [Safety-Kleen]. His promotion to Senior Sales and Service Representative may have also occurred after his initial threat to sue [Safety-Kleen]. It was not unusual for [Evers] to suggest suing [Safety-Kleen] for some reason or another.
>
> It was not surprising that [Evers] made statements about suing [Safety-Kleen] on several occasions following the changes in the compensation plan in early 2010. [Evers] made such statements in different contexts just as he had made similar statements on multiple occasions about his time as [branch general manager] in El Paso.
>
> As on all previous occasions, including my decisions to promote [Evers], I did not let [his] statements about suing

> [Safety-Kleen] affect my assessment of his performance or abilities. I completed the Forced Order Ranking . . . that I was asked to complete in late March 2010 based solely on my honest assessment of [Evers] and Harvey.
>
> It was my judgment . . . that Harvey was the better performer and had the most potential for advancement . . . .

(Doc. 33-2 at 34–35.)

Preston and Maroney reviewed Bell's Forced Order Ranking and concluded that they should retain Harvey and eliminate Evers' position. Preston and Maroney both claim that the outcome of the Forced Order Ranking was the sole basis for their decision to terminate Evers. Preston and Bell met with Evers on April 29, 2010 to inform him of the decision, effectively immediately. To this day, the Chandler branch still has only one customer service manager.

### G.    Evers' Termination According to Evers

Ever says that he was not aware of the Forced Order Ranking at the time Bell completed it, and he disputes much of what Bell wrote about him. He does not deny his DUI, which caused him to lose his commercial driver's license (a requirement for his position at Safety-Kleen) and could have led to immediate termination. He also admits that Safety-Kleen's decision not to fire him at that time required it to modify his duties, but he asserts that no one had a problem adapting to those modifications. He flatly denies missing a large amount of time due to personal issues or his DUI, and he denies that others in the Chandler branch had complained about his purported lack of respect.

Evers also points out that the Chandler branch hired an oil sales and service representative on March 3, 2010, and he claims he was qualified for that position. The Chandler branch hired a market sales specialist on April 19, 2010, ten days before it terminated Evers. It is undisputed that Evers performed that job in 2003, and Evers claims that he successfully held it through 2005 and was therefore qualified to do so again. In addition, the position of general manager in the Chandler branch was open at the time Evers was fired. Evers had applied for it, and he claims that he should have been

interviewed for it. However, he admits that his application for that position had been rejected by a computer automatically because Evers answered "no" to the question of whether he had a valid driver's license. Finally, following Evers' termination, the Chandler branch hired new employees for at least four other positions that Evers says he was qualified for, but Safety-Kleen never invited him to apply or otherwise informed him of those openings. Evers has not said whether he applied anyway.

Evers claims that his termination from Safety-Kleen resulted in loss of wages and a lengthy period of unemployment (he eventually found a lower paying job), depression, humiliation, and embarrassment. He further claims that the manner of his termination from Safety-Kleen made finding a new job harder because he had to disclose his termination on job applications.

**II.  STANDARD**

Summary judgment is warranted if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the nonmoving party would bear the burden of persuasion at trial, the moving party may carry its initial burden of production by submitting admissible "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1105–06 (9th Cir. 2000).

When the moving party has carried its burden, the nonmoving party must respond with specific facts, supported by admissible evidence, showing a genuine issue for trial. *See* Fed. R. Civ. P. 56(c). But allegedly disputed facts must be material — the existence of only "*some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, the nonmoving party's properly presented evidence is presumed to be true and all inferences from the evidence are drawn in the light most favorable to that party. *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285, 1289 (9th Cir. 1987).

## III. ANALYSIS

Considering: (i) the tension Evers perceived between him and Bell after the meeting regarding the computer system conversion; (ii) the portions of Bell's Forced Order Ranking that Evers claims are false; (iii) Bell's glowing review of Harvey in the Forced Order Ranking, despite the complaints about Harvey that Bell allegedly expressed to Evers in previous months; and (iv) that Safety-Kleen did not offer Evers the chance to apply to positions he was allegedly qualified for, Evers believes that he was fired in retaliation for threatening to institute legal action over the 2010 plan's retroactive application. He claims that the Forced Order Ranking was a pretextual paper trail initiated by Preston and Maroney. However, even if Preston and Maroney had called for the Forced Order Ranking with no pretext, Evers believes that Bell himself could have filled it out with the intent of making sure that Harvey came out on top, in retaliation against Bell for his threats about going to the labor board.

Evers has asserted a cause of action for retaliation, and one for the unpaid wages that originally led to this affair. The Court will address the unpaid wages first because Evers' entitlement to them establishes the potential for relief under his retaliation claim (although his retaliation claim ultimately fails).

### A. Count Two: Failure to Pay Wages

"[I]f an employer . . . fails to pay wages due any employee, the employee may recover in a civil action against an employer or former employer an amount that is treble the amount of the unpaid wages." A.R.S. § 23-355(A). "Wages" means

> nondiscretionary compensation due an employee in return for labor or services rendered by an employee for which the employee has a reasonable expectation to be paid whether determined by a time, task, piece, commission or other method of calculation. Wages include sick pay, vacation pay, severance pay, commissions, bonuses and other amounts promised when the employer has a policy or a practice of making such payments.

A.R.S. § 23-350(6).

Earned wages may not be reduced retroactively. "In the unilateral or at-will context, once [an] offer [of compensation] is accepted by commencement of performance, the terms cannot be changed. Thus, if an employer offers a day's pay for a day's work, the employer cannot, after employee performance, reduce the offer of pay that induced the performance." *Demasse v. ITT Corp.*, 194 Ariz. 500, 506 n.3, 984 P.2d 1138, 1144 n.3 (1999) (citing *Restatement (Second) of Contracts* § 45 (1981)). This principle attaches when the employee begins performance, as long as he or she completes it according to the terms of the offer. *Restatement (Second) of Contracts* § 45.

Safety-Kleen argues that it deserves summary judgment because Evers has not raised a triable issue of fact over whether he had "a reasonable expectation to be paid" under the 2009 compensation plan. "Evers," Safety-Kleen argues, "could not have had a reasonable expectation of receiving any commission payments under the 2009 Plan for period one in 2010 because the 2009 Plan only applied to the year 2009 and [Safety-Kleen] had issued a new plan, the 2010 plan, to govern the terms, conditions, and payouts of commissions in 2010." (Doc. 32 at 8.)

On the evidence presented in this motion, the only conclusion that can be reached is that Evers had "a reasonable expectation to be paid" for work done up to the end of the

four weeks following December 28, 2009, in accordance with the 2009 plan. Safety-Kleen's counter-argument is unavailing. The crux of the argument is its statement that "the 2009 Plan only applied to the year 2009." (Doc. 32 at 8.) Safety-Kleen's only evidence in support of this statement is the 2009 plan's official name ("2009 Customer Service Manager Compensation Plan") and that the plan declared itself effective "beginning Period 1, 2009." But the 2009 plan nowhere contains an expiration date, nor has Safety-Kleen offered any evidence that it revises its compensation plans every year. Under such circumstances, a reasonable jury must conclude that Evers had a reasonable expectation to be paid under the 2009 plan until told otherwise.

This conclusion is compelled by the retroactive nature of the 2010 plan. It is undisputed that the 2010 plan was not announced until near the end of January 2010. Safety-Kleen has nowhere argued that the 2010 plan actually had been promulgated on or before December 28, 2009 but Evers somehow missed the memo. Thus, until Evers learned of the 2010 plan in late January 2010, he had no basis for any expectation *other than* being paid under the 2009 plan. The clause in the 2009 plan reserving Safety-Kleen's right to modify the plan does not change this with respect to work already performed. *Demasse*, 194 Ariz. at 506 n.3, 984 P.2d at 1144 n.3.

Safety-Kleen nonetheless insists that the 2010 plan was not retroactive because "[Safety-Kleen] issued a new plan, the 2010 Plan, to govern commission payouts for work performed in 2010. The 2009 Plan on its face applies to the year 2009 and not any subsequent year." (Doc. 38 at 3.) But Safety-Kleen cannot simply call its new plan the "2010 Plan" and thereby avoid the problems of retroactivity. If it applies to conduct that took place before it was announced, it is retroactive no matter what name Safety-Kleen puts on it.

Summary judgment for Safety-Kleen is not appropriate. On this record, summary judgment for Evers would have been appropriate had Evers cross-moved. But absent such a cross-motion, the Court may not enter summary judgment in Evers' favor.

### B. Count One: Retaliation for Whistleblowing

#### 1. Legal Standard

Arizona recognizes a cause of action for whistleblowing employees who have suffered an adverse employment action:

> An employee has a claim against an employer for termination of employment . . . if * * * [t]he employer has terminated the employment relationship of an employee in retaliation for * * * [t]he disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer . . . has violated . . . the Constitution of Arizona or the statutes of this state to either the employer or a representative of the employer who the employee reasonably believes is in a managerial or supervisory position and has the authority to investigate the information provided by the employee and to take action to prevent further violations of the Constitution of Arizona or statutes of this state or an employee of a public body or political subdivision of this state or any agency of a public body or political subdivision.

A.R.S. § 23-1501(3)(c)(ii). In other words, the employee must prove:

1. he had information or a reasonable belief that his employer or another employee had violated an Arizona statute or constitutional provision; and
2. the information or belief must have been disclosed to either —
   a. the employer or a representative of the employer whom the employee reasonably believed was in a managerial or supervisory position and had the authority to investigate the information provided by the employee and to take action to prevent further violations of the Constitution of Arizona or statutes of this State; or
   b. an employee of a public body or political subdivision of this State or any agency of a public body or political subdivision; and
3. the employer terminated the employee because of elements 1 and 2.

*See* Rev. Ariz. Jury Inst. (Civ. 4th) Employment Law 9A. Evers never went to the Industrial Commission, so element 2b has no relevance here.

### 2. "Important Public Policy"

Before the legislature enacted A.R.S. § 23-1501, employees brought whistleblowing retaliation claims under a wrongful discharge action recognized by the Arizona Supreme Court in *Wagner v. City of Globe*, 150 Ariz. 82, 722 P.2d 250 (1986). *Wagner* built on *Wagenseller v. Scottsdale Memorial Hospital*, which held that employees have a cause of action against their employers if they are fired "for bad cause — that which violates public policy." 147 Ariz. 370, 378, 710 P.2d 1025, 1033 (1985). *Wagner* reasoned that firing an employee for exposing an employer's violation of the law contravenes public policy. *Wagner*, 150 Ariz. at 89, 722 P.2d at 257. However, *Wagner* warned that "whistleblowing activity [must] serve[] a public purpose" and "further the public good" rather than a "merely private or proprietary" purpose. *Id.*; *see also Wagenseller*, 147 Ariz. at 380, 710 P.2d at 1035 (requiring wrongful discharge claims to further "important public policy interests embodied in the law").

The text of A.R.S. § 23-1501, enacted in 1996, does not expressly restate the "important public policy" requirement from prior case law. For two reasons, however, the Court concludes that "important public policy" requirement from *Wagner* continues to apply. First, A.R.S. § 23-1501 was generally intended to narrow the scope of wrongful discharge causes of action. Marzetta Jones, *The 1996 Arizona Employment Protection Act: A Return to the Employment-at-Will Doctrine*, 29 Ariz. L. Rev. 1139, 1149–55 (1997). An intent to supersede *Wagner*'s "important public policy" requirement would be contrary to this general purpose because it creates the possibility that any violation of a state statute, no matter how trifling, could form the basis for a whistleblowing retaliation claim. Second, the "important public policy" requirement comports with society's general understanding that whistleblowing brings to light important issues of broad interest, rather than essentially personal disputes.

Under this standard, Evers' claim fails. Evers has a claim for unpaid wages. This is a "merely private or proprietary" purpose. *Wagner*, 150 Ariz. at 89, 722 P.2d at 257. Accordingly, Evers is not entitled to protection under A.R.S. § 23-1501(3)(c)(ii).

### 3. Causation

Evers' claim also fails the third element — causation. This element raises questions of the standard to apply. Evers offers the *McDonnell-Douglas* burden-shifting framework used Title VII cases. (*See* Doc. 37 at 14.) The Court could locate no Arizona case law applying *McDonnell Douglas* to a whistleblowing claim under A.R.S. § 23-1501(3)(c)(ii). Two cases from this District, however, have implicitly assumed the *McDonnell Douglas* approach applies. *Levine v. TERROS, Inc.*, No. CV 08-1458-PHX-MHM, 2010 WL 864498, at *10 (D. Ariz. Mar. 9, 2010) (citing *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 798 (9th Cir.1982), which applies *McDonnell Douglas* to a Title VII retaliation claim); *Knox v. United Rentals Highway Techs., Inc.*, No. CV 07-0297-PHX-DKD, 2009 WL 806625, at *5 (D. Ariz. Mar. 26, 2009) (same). In these cases, the causation element is characterized as a question of whether the employer "had a retaliatory motive that played a part in the employment action," determined as follows: first, the employee "must present evidence sufficient to raise the inference that [his or] her protected activity was the likely reason for the adverse action"; second, "the defendant [must] articulate some legitimate, non-retaliatory reason for the adverse action"; and third, "the plaintiff must then show that the asserted reason was a pretext for retaliation." *Cohen*, 686 F.2d at 796.

Cases concerning termination in retaliation for exercising First Amendment rights illustrate a somewhat different approach. Beginning with *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), these cases have established a two-part burden-shifting scheme where

> an employee must [first] prove that the conduct at issue was ... protected, and that it was a substantial or motivating factor in the termination. If the employee discharges that

> burden, the [employer] can escape liability by showing that it would have taken the same action even in the absence of the protected conduct.

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 675 (1996) (citing *Mt. Healthy*, 429 U.S. at 287).

For two reasons, the Court predicts that Arizona courts would choose the *Mt. Healthy* approach over the *McDonnell Douglas* approach (or any other approach). First, *Mt. Healthy* asks whether the protected speech was "a substantial or motivating factor" in the discharge, which closely resembles the "substantial motivating factor" test applied by Arizona courts to whistleblowing retaliation claims before A.R.S. § 23-1501(3)(c)(ii). *See Murcott v. Best Western Int'l, Inc.*, 198 Ariz. 349, 360, 9 P.3d 1088, 1099 (Ct. App. 2000) (indirectly discussing a "substantial motivating factor" test applied to a retaliatory discharge claim brought under *Wagner*). Second, *Mt. Healthy*'s second step — whether the employer would have taken the same action in the absence of the whistleblowing — ensures that employees will not blow the whistle simply to put themselves in a more secure position than they would have been otherwise. *Mt. Healthy* explained that

> [a] rule of causation which focuses solely on whether protected conduct played a part, 'substantial' or otherwise, in [the adverse employment decision], could place an employee in a better position as a result of the exercise of . . . protected conduct than he would have occupied had he done nothing. [Such causation test] would require [undoing the adverse employment decision] in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the [decision], and does indeed play a part in that decision even if the same decision would have been reached had the incident not occurred. The [employee is adequately protected] if [he] is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of . . . protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his

> performance record and reaching a decision . . . on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

*Mt. Healthy*, 429 U.S. at 285–86.  *Mt. Healthy* therefore permitted the employer to "show[] by a preponderance of the evidence that it would have reached the same decision . . . even in the absence of the protected conduct." *Id.* at 287.

Applying these principles to Evers' case, it is worth noting that Evers has not challenged the legitimacy of Preston's economically driven choice to eliminate one of the Chandler branch's customer service manager positions.  Evers only argues that the choice between himself and Harvey was a foregone conclusion because either Preston, or Bell, or both wanted to retaliate against him.  But even if a retaliatory motive played some part, a reasonable jury could only conclude that Safety-Kleen would have made the same decision anyway, even assuming a jury believed Evers that Harvey was less effective in the customer service manager position than Evers.  As between Evers (a candidate with a DUI who could have been fired immediately upon incurring that DUI and who could no longer satisfy his job description without accommodations) and Harvey (who had no DUI and was at least somewhat qualified, given that he had been doing the job for at least as long as Evers) a jury could only conclude that Safety-Kleen would have picked Harvey over Evers despite Evers' purported whistleblowing.  Accordingly, Evers' whistleblowing cause of action fails and summary judgment in Safety-Kleen's favor is appropriate.

IT IS THEREFORE ORDERED "Defendant's Motion for Summary Judgment" (Doc. 32) is GRANTED as to Plaintiff's first cause of action (wrongful termination) and DENIED as to Plaintiff's second cause of action (failure to pay wages).

Dated this 19th day of March, 2012.

_____
Neil V. Wake
United States District Judge

- 16 -